AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Western District of Arkansas

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

MAY 3 1 2019

DOUGLAS F. YOUNG, Clerk
By _____
                Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The premises, structures, and vehicles located<br>at 8135 Rally Hill Road, Everton, Arkansas | )<br>)<br>)<br>)<br>)<br>)    Case No.  3:19 CM 19 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Western _____ District of ____ Arkansas (Harrison Div.) ____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Distribution of Methamphetamine |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:
See Attached Affidavit of FBI SA Justin Ledzinski.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Justin Ledzinski
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/31/19

_____
*Judge's signature*

City and state:  Fort Smith, Arkansas

Hon. Mark E. Ford, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF THE LOCATION TO BE SEARCHED

The premises, home, and curtilage of the home located at 8135 Rally Hill Road, Everton Arkansas, 72633 pictured below. The home itself is situated at the intersection of Rally Hill Road and Meadowbrook Lane, on the north side of Rally Hill Road and west side of Meadowbrook Lane, with the front of the home facing south. The home itself is a trailer with an orange roof and an attached building on the northern side as pictured below.

All sheds/outbuildings or containers located at 8135 Rally Hill Road, Everton Arkansas, 72633.

All vehicles located at or in 8135 Rally Hill Road, Everton Arkansas, 72633 at the time of the execution of the search warrant.





## ATTACHMENT B

### ITEMS TO BE SEARCHED FOR AND SEIZED:

Articles of personal property tending to establish and document possession and/or distribution of controlled substances; or a conspiracy to do such; structuring or money laundering (financial transactions) designed to conceal or disguise the nature, location, source, ownership, or control of proceeds of a controlled substance, or to avoid a transaction reporting requirement; including but not limited to the following:

1. Controlled substances, buyer lists, seller lists, ledgers, financial records relating to the purchase, sale, or distribution of controlled substances, paraphernalia including but not limited to weight scales and packaging material.

2. Books, records, receipts, notes, bank statements and other bank records, money drafts, letters of credit, money orders, cashiers checks, and other monetary instruments, passbooks, bank checks, safe deposit box keys and records, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of proceeds from the sale of controlled substances; items providing evidence pertaining to structuring or money laundering, and documentation evidencing the expenditure of the proceeds of narcotics distribution to acquire assets, including, but not limited to, the purchase of vehicles, clothing, furniture, and electronic equipment.

3. Income tax returns, W-2 and W-4 forms, receipts, and other documents pertaining to the filing of personal and business tax returns.

4.  United States currency and other financial instruments in amounts indicative of the proceeds of illegal drug trafficking.

5.  Indicia of occupancy, residency, and/or ownership of real property including but not limited to utility and telephone bills, mortgage payment receipts and keys.

6.  Papers, tickets, notes, schedules, receipts, and other items relating to domestic, international, and interstate travel.

7.  Photographs, and/or video tape reproductions of co-conspirators, assets, or controlled substances.

8.  Personal and business calendars, address and/or telephone books, rolodex indices, pager or cellular telephone memory, and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers, telex numbers, correspondences of the subjects of the investigation, and their criminal associates, sources of supply, customers, and financial institutions.

9.  Weapons and counter-surveillance equipment that might be utilized in the conduct of illegal drug transactions.

10. Cellular Telephones, personal telephone books, telephone records, electronic memory chips, SIM cards utilized in cellular telephones, computers, tablet computing devices and data storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on cellular telephones, electronic memory chips, SIM cards, electronic storage devices, computers or PDA's whether in files or disc, drives, in memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or

otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device. Agents are authorized to search computers, backup media and other digital media storage devices on the premises. If Agents cannot, for technical reasons or because of the volume of information, search on site, then Agents are authorized to make an image of hard drives or seize the computers, printers, backup digital media, hard disk drives or other devices capable of storing digital media and remove them to a laboratory setting to retrieve the listed information. Agents are authorized to seize any and all software, manuals, passwords, or any other instructions necessary to read, understand, or interpret the above-described information. Under Rule 41(f)(1)(B), Agents may retain a copy of that information for purposes of the investigation. The government proposes that the original storage media plus a full image copy of the seized media be retained by the government.

11. Robert Leroy Black.

12. Lindsey Brooke Johnson, a/k/a Lindsey Brooke Campbell, a/k/a Lindsey Brooke Thomason.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HARRRISON DIVISION

IN THE MATTER OF THE SEARCH OF
THE PREMISES, STRUCTURES, AND
VEHICLES LOCATED AT 8135 Rally Hill        **Filed Under Seal**
Road, Harrison, Arkansas

## **AFFIDAVIT IN SUPPORT OF**
## **AN APPLICATION FOR A SEARCH WARRANT**

I, FBI Special Agent Justin Ledzinski, being first duly sworn, hereby depose and state as

follows:

### **INTRODUCTION AND AGENT BACKGROUND**

**1.**      This affidavit is being submitted in support of an application for a search

warrant for the premises, residence and vehicles located at 8135 Rally Hill Road,

Harrison, Arkansas which is the residence of Lindsey Brooke Johnson, Diana Johnson,

and Robert Black (hereafter 'subject property'). The subject property is described with

more particularity in Attachment A to this search warrant application. Because this

Affidavit is being submitted for the limited purpose of establishing probable cause to

search the subject property, it does not include all of the information known to me as part

of this investigation, but only information sufficient to establish probable cause for the

requested search warrant. The items to be seized pursuant to this search warrant are

described herein and in Attachment B.

**2.**      I have been a Special Agent with the FBI for over ten (10) years. I am

currently assigned to the Little Rock Office, Fayetteville Resident Agency of the FBI,

and have been so since November of 2007. From 2005 to 2007, I was assigned to the

Laredo, Texas Resident Agency of the FBI. In connection with my FBI duties, I have

Affidavit of FBI SA Justin Ledzinski Page 1

received specialized training in the enforcement of federal narcotics laws. This training and experience has involved, among other things, (a) the debriefing of defendants, witnesses, and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, harboring, shielding, smuggling and employment of illegal aliens and of the laundering and concealment of proceeds of drug trafficking; (b) surveillance; (c) analysis of documentary and physical evidence; (d) conducting undercover operations; (e) preparing and executing state and federal search warrants and arrest warrants; (f) collecting information to further investigations; and (g) arresting individuals involved in drug trafficking violations. I also have experience in investigations involving the interception of wire communications. I am currently assigned to the Organized Crime Drug Enforcement Task Force (OCDETF). Based on this training and experience, I have become familiar with the manner in which narcotics traffickers conduct their drug-related businesses, including the methods employed by narcotics dealers to import and distribute narcotics. I have also become familiar with their use of coded language to refer to narcotics, drug proceeds, and other aspects of narcotics trafficking. I have been personally involved in several investigations involving the unlawful possession, manufacture, and distribution of controlled substances, including cocaine and methamphetamine as well as investigations involving money laundering offenses. I have also been personally involved in several drug trafficking organization investigations that included the interception of wire communications.

**3.** Regarding the business of illegal narcotics trafficking, I am also aware of the following things based upon my training and experience:

**a.** That drug dealers very often place assets, including accounts at financial institutions, in names other than their own to avoid detection by government or other law enforcement agencies.

**b**. That even though these assets are in other names, the drug dealers continue to use these assets and exercise dominion and control over them.

**c**. That drug dealers frequently maintain on-hand amounts of United States currency in order to maintain and finance their ongoing illegal drug business.

**d**. That drug dealers often maintain books, records, receipts, notes, ledgers, computers, computer disks, tickets, money orders, cashier's checks, wire transfer receipts, and similar drug related financial documents and records pertaining to the transportation, ordering, sale and distribution of illegal drugs. Furthermore, such documents are often written in code.

**e.** That drug dealers commonly front (provide illegal drugs on consignment) to their clients and often keep the aforementioned items so they can account for their drugs, the money owed for these drugs, and who has or owes for these drugs.

**f.** That the aforementioned books, records, receipts, notes, ledgers, tickets, money orders, cashier's checks, and similar financial documents and records, including computers, computer disks, diskettes, and hard drives, and other media are maintained where the drug dealers have ready access to them.

3

**g.** That it is common for drug dealers to conceal contraband, large amounts of currency, precious metals, jewelry, address lists, telephone lists, proceeds of drug sales, and records of drug transactions in secure locations within their residences, yards, garages, offices, businesses, automobiles, safes, safe deposit boxes, and obscure locations known only to them, i.e., mail drops, mini storage warehouses, etc., for ready access and to conceal the same from law enforcement authorities.

**h.** That persons involved in illegal drug trafficking conceal in their residences, yards, offices, businesses, safes, garages, storage buildings, vehicles, safe deposit boxes, and obscure locations, caches of drugs, large amounts of currency, weapons, financial instruments, precious metals, jewelry, and other items of value and/or proceeds from drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of money made from engaging in illegal drug trafficking activities.

**i.** That drug dealers often purchase expensive vehicles, businesses and residences with the proceeds from their drug transactions. Also, that drug dealers frequently change vehicles and register vehicles in other names to avoid detection by law enforcement personnel.

**j.** That drug dealers amass large proceeds from the sale of illegal drugs, they often attempt to legitimize their profits and maintain evidence of financial transactions relating to the obtaining, transferring, secreting or

4

spending of large sums of money derived from their illegal drug distribution activities.

**k.** That to accomplish these goals, drug dealers utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts, telephones, cellular telephones, facsimile machines, digital and various paging devices, and two-way radio systems. Furthermore, drug dealers frequently change telephone numbers, paging devices and telephone instruments.

**l.** That drug dealers commonly maintain addresses and telephone numbers in books or papers which reflect names, alias names, addresses, and telephone numbers for their associates in their illegal drug trafficking.

**m.** That drug dealers take or cause to be taken photographs, video and digital audiotapes of themselves, their associates, their property, and their illegal products. Furthermore, these drug dealers often maintain these photographs, video and audiotapes in their residences, offices, safes, garages, storage buildings, vehicles and safe deposit boxes.

**n.** That drug dealers frequently keep paraphernalia for packaging, diluting, weighing, and distributing the illegal drugs. Furthermore, this paraphernalia includes, but is not limited to, scales, plastic bags, diluting agents, boxes, trash compactors, heat sealers, and sealing tape.

**o.** That the courts have recognized that unexplained wealth is probative

5

evidence of crimes motivated by greed, and in particular, illegal trafficking in controlled substances.

**p.** That drug traffickers very often possess firearms and other weapons for the purpose of protecting their drug trafficking enterprises from the efforts of law enforcement authorities as well as from persons who might attempt to steal any drugs or money possessed by the drug traffickers.

**q.** Affiant is aware that drug traffickers often maintain extra residences as stash houses, meeting locations, and temporary housing for drug associates. Furthermore, these residences are frequently rented, purchased or titled in others names even though the residences remain in the control of the drug traffickers.

**r.** In the Affiant's experience as an investigator, it has been found that illegal drug trafficking is frequently a continuing activity over months and even years. Illegal drug traffickers typically will obtain and distribute controlled substances on a regular basis much as a distributor of a legitimate commodity would purchase stock for sale, and similarly, such drug traffickers will have an inventory which will fluctuate in size depending upon the demand for the product. The Affiant expects the drug trafficker to keep records of his illegal activities for a period extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which he might still be owed money, or might owe

6

someone else money.  Drug traffickers frequently use third parties to transport shipments of illegal drugs and cash proceeds from the sale of illegal drugs.  These third parties use a variety of methods to transport shipments of illegal drugs and cash, including automobiles.

**4.**      I have personally participated in the investigation set forth below.  I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of FBI and other law enforcement officers.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent or law enforcement officer.  Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.  In addition, this affidavit is based on information from the following sources:

a.   Oral and written reports about this and other investigations which I have received from federal agents and local law enforcement;

b.   Physical surveillance conducted by federal agents and task force officers (TFO), or local law enforcement agencies, the details of which have been reported to me either directly or indirectly;

c.   A review of telephone toll records, and subscriber information; and cell phone location data obtained by Court order;

d.   Public records;

e.  A review of line sheets detailing intercepted telephone calls related to this investigation[1];

f.  A review of audio recordings of intercepted telephone calls related to this investigation;

g.   Information provided by reliable confidential sources of information and cooperating defendants; and

h.  My training and experience as a Special Agent and the training and experience of other Special Agents of FBI and other law enforcement officials.

**5.**      Based on the facts set forth in this affidavit, there is probable cause to believe that the subject property described in Attachment A has been used and continues to be used to commit violations of 21 U.S.C.§ 841(a)(1) and 846 as provided in 18 U.S.C. § 2.  There is also probable cause to believe that the items to be seized described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of additional individuals who are engaged in the commission of these offenses.

**6.**      Your affiant further states that there is probable cause to believe that the items sought for seizure will lead to evidence of the aforementioned conspiracy to distribute controlled substances as well as the identification of individuals who are engaged in the commission of that crime and related crimes.

---

[1] In some locations, line sheets are quoted.  These quotes are not intended to be taken as an exact quotation of the conversation between the parties, but do reflect for the reader to capture the essence of the conversation between the parties.

8

### Current Posture of the Investigation

7.     On May 8, 2019, a Grand Jury sitting in the Western District of Arkansas issued Indictments against JASON ALVAREZ, ZACHERY MANNING, LINDSEY BROOKE JOHNSON, ROBERT BLACK and others not listed here.  All were indicted for various violations if 21 U.S.C. § 841(a)(1) and 846.

8.     Based upon the investigation conducted by Affiant and Special Agents and Task Force Officers of the FBI, and other federal state and local law enforcement agencies, it is the belief of the Affiant that JASON ALVAREZ supplied methamphetamine to ZACHERY MANNING, LINDSEY BROOKE JOHNSON and ROBERT BLACK, who in turn sold it to their own methamphetamine customers.

### Probable Cause Regarding the Subject Property

9.     On November 29, 2018, a confidential informant working in conjunction with the FBI conducted a controlled purchase of methamphetamine from Zachery Manning.  The confidential informant has a criminal history which includes convictions in the State of Arkansas for felony theft of property and residential burglary in 2005 and misdemeanor theft of property in 2016; and convictions in the State of Missouri for misdemeanor theft in 2014 and felony burglary in 2016.  The confidential informant was receiving consideration on this arrest in exchange for their efforts as a confidential source.  The confidential informant's information has been corroborated as truthful through surveillance, telephone toll analysis, controlled purchases of methamphetamine, and wire and electronic interceptions.  As such, I believe the information provided by the confidential informant is truthful and can be trusted as accurate.

9

**10.** When the confidential informant met with Zachery Manning to conduct the purchase, Manning explained that they would have to travel to obtain the methamphetamine. To that end, ultimately Manning entered the confidential informant's vehicle and they traveled to the subject property, where Manning went inside while the confidential informant waited in the vehicle. Upon returning to the vehicle, the informant reported that Manning possessed what appeared to be three (3) ounces of methamphetamine. Manning provided two of them to the informant in exchange for $1,050.00 in United States currency and kept the additional third ounce of methamphetamine for himself. The informant returned Manning to his residence at the conclusion of the transaction. The methamphetamine was sent to the DEA laboratory for further testing, which confirmed the substance to be 50.5 grams of actual methamphetamine.

**11.** At the time of the purchase of methamphetamine on November 29, 2018 described above, the FBI did not know the identity of the residents of the subject property. The subsequent investigation in 2019 revealed the residents to be Dianna Johnson, Lindsey Johnson, and Robert Black[2], who is in a romantic relationship with Lindsey Johnson.

**12.** On February 19, 2019, the Honorable P.K. Holmes, III authorized the interception of wire and electronic interceptions from telephone number 870-577-4617. 870-577-4617 (hereafter, "Manning telephone") which was utilized by Zachery Manning,

---

[2] Although not at the subject property, the FBI has conducted controlled purchases of methamphetamine from Robert Black on September 28, 2018 (157.8 grams) and October 10, 2018 (183 grams). These controlled purchases were conducted at a former residence of Robert Black on Mikes Road in Harrison, Arkansas, which Black vacated towards the end of 2018 or beginning of 2019.

10

a methamphetamine seller in the Harrison, Arkansas area. Interceptions on the Manning telephone began in the evening hours of February 19, 2019 and ceased on March 15, 2019, when Zachery Manning was arrested by the State of Arkansas for possession of methamphetamine with purpose to distribute and simultaneous possession of drugs and firearms after a traffic stop in Harrison, Arkansas.

13. On February 26, 2019 at approximately 4:14 pm, Manning received a text message from his supplier of methamphetamine Jason Alvarez who stated ""Zach its tiny I need Lindsey to hit me up right now I need everything she jas n is avoiding my calls right now."

14. Later that same day, between 4:48 pm and 4:49 pm, the following text message dialogue occurred between Manning and Alvarez:

> ZM: Ok well call bbn me when u can and how much does she owe (4:48 pm)
>
> Tiny: 13 (4:49 pm)
>
> ZM: Ok (4:49 pm)
>
> ZM: We got u (4:49 pm)

Based on my training, experience, and knowledge of this investigation, I believe that when Alvarez stated he needed everything Lindsey has, he is asking Zachery Manning to help him contact Johnson so he can collect money derived from methamphetamine sales from her. I further believe Johnson owed Alvarez $13,000 from methamphetamine sales as of February 26, 2019.

11

15.     Wire and electronic interceptions indicated that later that day, Manning would be traveling to Lindsey Johnson's location.   In the evening hours, FBI investigators followed Manning to the subject property.  At approximately 8:10 pm, the FBI observed as Johnson left the vehicle in his residence followed by Manning in his vehicle.  Interceptions from the Manning telephone indicated that FBI surveillance had likely been compromised, therefore, surveillance was terminated.

16.     On March 15, 2019, the Harrison Police Department received a call from a local hotel.  The hotel staff stated that Lindsey Johnson had vacated her room at the hotel and left behind a backpack containing a large amount of United States Currency.  HPD Det. Matt Odom responded to the hotel and was presented with a backpack containing a large amount of money and notes which are best described as owe-paid ledgers.  In my experience, such ledgers are commonly maintained by drug dealers to keep an accounting of the drugs they have provided on credit.  The money was later counted and found to be $14,733 in United States Currency.

17.     While Det. Odom was at the hotel, Johnson contacted the hotel.  The hotel staff put Johnson on the telephone with Odom.  Odom informed Johnson that he was in possession of her backpack and they made arrangements to meet at the Harrison Police Department on March 18, 2019.

18.     On March 18, 2019, Lindsey and Dianna Johnson arrived at the police department and were each interviewed separately by Det. Odom after being advised of their Miranda warnings.  In their interviews, they gave conflicting stories.  Lindsey Johnson stated that the money was given to her by her mother Dianna, who gave it to her to buy a house.  Dianna Johnson stated that she had given the money to Lindsey, but

12

knew nothing about the purchase of a house. Neither Dianna nor Lindsey Johnson could tell Det. Odom the amount of money that was in the backpack. Later in the investigation, as will be described below, investigators confirmed that the stories given by both Dianna and Lindsey Johnson were false. The $14,733 is currently pending in a State of Arkansas forfeiture lawsuit in Boone County, Arkansas.

**19.** On March 27, 2019, the Boone County Sheriff's Department received a complaint from the owner of 8183 Rally Hill Road, the home next door to the subject property, that his tenants were involved in nefarious drug activity at the residence. The landlord identified his tenants as "Lindsey and Robert Battenfield." Investigators showed the landlord photographs of Lindsey Johnson and Robert Black and he identified them as his tenants "Lindsey and Robert Battenfield," which investigators determined was a false last name.

**20.** The Boone County Sheriff's Department obtained an arrest warrant for Lindsey Johnson for a State of Arkansas drug offense and was aware that Robert Black had multiple arrest warrants outstanding for being an absconder from State of Arkansas supervision. A search warrant for the 8183 Rally Hill Road residence was obtained by the State of Arkansas to locate Black and Johnson inside the residence. It was served the same day. Upon arrival at 8183 Rally Hill Road for service of the search warrant, officers observed Johnson attempt to flee from the subject property next door. Johnson was arrested and in a field interview Johnson admitted that Black had fled as well. Black was not apprehended. The search warrant of the property inhabited by Black and Johnson yielded methamphetamine, paraphernalia associated with

13

both the use and sale of methamphetamine, and a security system with 5 cameras pointed at all of the points of ingress and egress of the 8183 Rally Hill Road residence.

21.     On April 19, 2019, investigators still had not located Robert Black for the State of Arkansas absconding warrants that they attempted to serve on March 27, 2019. On that date, the Arkansas State Police and Boone County Sheriff's Office were attempting to locate Black in the area of the subject property.  The investigators noticed a pickup truck associated with Black on the roadway near the subject property.  Upon seeing marked patrol units, the subject driving the vehicle, presumably Black, exited the vehicle and fled o n  f o o t  from investigators into the woods north of the subject property.  Investigators pursued the subject, but were unsuccessful in locating him.  An inventory of the vehicle from which the individual fled yielded a large sum of U.S. Currency, rudimentary pay-owe accounting ledgers, and numerous cellular telephones.  Based on my experience, specifically my experience with Robert Black, I believe these items are indicative of drug trafficking. One of the cellular telephones seized from the pickup was later forensically searched by the Boone County Sheriff's Department.  The results of the search indicated that Robert Black was the owner/user of the cellular telephone and thus the person who fled from investigators near the subject property.

22.     A short time later, Lindsey Johnson arrived at the subject property operating a vehicle registered to her mother, Dianna Johnson.  A narcotics-detecting canine was deployed on the vehicle, which alerted to the presence of narcotics in the vehicle.  The vehicle was searched, and $4,920 in U.S. Currency was located.  A controlled sniff of the $4,920 in currency was conducted by the narcotics-detecting canine, which alerted to the presence of narcotics on the money.  Based on my

14

experience, specifically my experience with Lindsey Johnson, I believe that her possession of this money is indicative of drug trafficking. While at the subject property, Lindsey Johnson was interviewed and stated that she lives at the subject property with her mother, Dianna Johnson. Johnson refused to sign a receipt for the currency, which was seized by the Boone County Sheriff's Department pending an asset forfeiture lawsuit.

23.     Investigators returned to the subject property on April 23, 2019 to attempt to locate Robert Black and again get Lindsey Johnson to sign the receipt for the currency seized on April 19, 2019. Johnson again refused to sign the receipt and confirmed that she resides in the subject property with Dianna Johnson. Johnson stated she had not seen Black in some time, which I believe to be false based upon Black's presence near the subject property on April 19, 2019.

24.     On May 23, 2019 an interview was conducted with Jason Alvarez, the supplier of methamphetamine for Johnson and Manning. Alvarez confirmed that Lindsey Johnson and Zachery Manning were supplied methamphetamine by him, and additionally confirmed that Black and Johnson are in a romantic relationship; however, Alvarez stated he had never met Black. Alvarez stated that Johnson was in arrears by several thousand dollars for methamphetamine he had previously provided her and specifically stated that Johnson had informed him that she had lost a large methamphetamine payment at a hotel. Thus, it is confirmed that the stories given by Dianna and Lindsey Johnson on March 18, 2019 are false. I further believe based on this and Lindsey Johnson's residence at the subject property with her mother that Dianna Johnson is likely involved in the trafficking of methamphetamine as well.

15

**25.** Based on the above paragraphs, Affiant submits that Lindsey Johnson, Dianna Johnson and Robert Black have utilized and continues utilize the subject property described in Attachment A for drug trafficking activities in violation of 21 U.S.C. 841(a)(1) and 846.

**26.** As such, your affiant asserts that there is probable cause to believe that evidence of a Conspiracy to Distribute Controlled Substances in violation of Title 21, United States Code, Sections 841(a) and 846 will be maintained in properties described in Attachment A. Thus, Affiant prays that a search warrant will issue.

## JUSTIFICATION FOR A "NO KNOCK" SEARCH WARRANT

**27.** I assert that a search warrant which is executable without the "knock and announce" requirement is necessary to protect the safety of the officers executing the warrant, safety to the public, to prevent the destruction of evidence and to prevent the flight of the subjects to be arrested, Robert Black and Lindsey Johnson. As noted above, on March 27, 2019, Black successfully fled and Johnson attempted to flee from the subject property when investigators sought to serve a search warrant on an adjacent property. Moreover, on April 19, 2019, Black fled from his vehicle near the subject property when investigators were conducting surveillance on the subject property. Finally, when investigators served a search warrant on the former residence of Lindsey Johnson and Robert Black at the property next door to the subject property on March 27, 2019, investigators located a security system that was used by the occupants to detect when persons, such as law enforcement, may be attempting to access their property. As

16

such, Affiant prays that a search warrant for the subject property will issue which

dispenses with the "knock and announce" requirement.


Respectfully submitted,



Justin Ledzinski
Special Agent, FBI



Subscribed and sworn to before me on ___May 31___, 2019.



Hon. Mark E. Ford
United States Magistrate Judge

17